OPINION
{¶ 1} Defendant-appellant Thomas Peck appeals from his conviction and sentence, following a no-contest plea, for Aggravated Robbery. Peck contends that the trial court erred in denying his motion to suppress statements he made to investigating police officers upon the ground that they were not voluntary. Peck also contends that his trial counsel was constitutionally ineffective for having failed to request a continuance of the suppression hearing to procure the attendance of a non-appearing witness.
 {¶ 2} We conclude that the record supports the trial court's conclusion that Peck's statement to the police officers was voluntary. We also conclude that even if Peck's trial counsel's performance could be deemed to have been deficient because he failed to request a continuance of the suppression hearing to procure the attendance of a non-appearing witness, the record fails to demonstrate that Peck was prejudiced as a result. The witness would not appear to have been present during the statement the voluntariness of which Peck was contesting, and no proffer was made to indicate what the witness's testimony was expected to be, or how it would have demonstrated the involuntariness of Peck's statement to the police. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} Peck was wanted for questioning by Dayton police concerning several robberies. Between 3:00 and 4:00 a.m. on May 11, 2005, Peck was arrested and brought to the Montgomery County Jail. Around noon, that same day, Peck was transported by Dayton police detective Brad Daugherty to an interview room in the special investigations section of the sheriff's office. Peck was advised of his rights under Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and waived those rights. Two other Dayton police detectives, Kent Saunders, and a detective Vitali, were also present. Vitali was new; he just sat in a corner of the interview room and watched.
 {¶ 4} Although Peck initially denied involvement in any of the robberies, he ultimately made an incriminating statement. Upon request, he made a written statement.
 {¶ 5} Peck moved to suppress his statements, contending that they were not made knowingly and voluntarily. Following a hearing, the trial court denied Peck's motion to suppress. Thereafter, Peck pled no contest to one count of Aggravated Robbery, was found guilty, and was sentenced accordingly. From his conviction and sentence, Peck appeals.
 II {¶ 6} Peck's First Assignment of Error is as follows:
 {¶ 7} "THE TRIAL COURT ERRED IN FINDING APPELLANT'S STATEMENTS WERE VOLUNTARY AS THE STATE FAILED TO ESTABLISH APPELLANT MADE A KNOWING, VOLUNTARY AND INTELLIGENT WAIVER OF HIS RIGHTS TO REMAIN SILENT AND TO COUNSEL AND ANY STATEMENTS MADE RESULTED FROM COERCIVE POLICE BEHAVIOR."
 {¶ 8} At the conclusion of the suppression hearing, at which Dayton police detectives Daugherty and Saunders, and Peck, himself, testified, the trial court found, based upon the testimony and evidence before it, that Peck "knowingly and voluntarily and intelligently waived his right to counsel and to remain silent and the other Miranda rights." We have reviewed the entire transcript of the suppression hearing, and we conclude that there is evidence in that transcript to support the trial court's finding.
 {¶ 9} Peck contends that the record supports a conclusion that he "lacked normal cognitive functions due to heavy inebriation caused by cocaine and depressant usage immediately before the subject interrogation," and that he "suffered from suicidal tendencies, and * * * had attempted to commit suicide on the same night." These contentions depend upon Peck's testimony at the suppression hearing. The trial court evidently did not find Peck to be a credible witness, and neither do we.
 {¶ 10} Besides testifying that he had ingested cocaine, and then later took "about 14" Klonopins to "bring myself down," Peck testified that he had cut his wrists in a suicide attempt before his arrest. On cross-examination, Peck testified as follows:
 {¶ 11} "Q. So it's your testimony that you tried to kill yourself the night before being arrested?
 {¶ 12} "A. Yes, ma'am.
 {¶ 13} "Q. And that you were slashing your wrist.
 {¶ 14} "A. Yes, ma'am.
 {¶ 15} "Q. And you were bleeding over in the jail from slashing your wrist.
 {¶ 16} "A. Yes, ma'am.
 {¶ 17} "Q. And no one over in the jail gave you any type of medical attention.
 {¶ 18} "A. No, ma'am.
 {¶ 19} "Q. And in fact, when Detective Saunders — or Detective Daugherty and Detective Clymer came to get you, you were still bleeding.
 {¶ 20} "A. Yes, ma'am.
 {¶ 21} "Q. Your blood was still dripping —
 {¶ 22} "A. Not heavily, no, not like that. It was just open wound.
 {¶ 23} "Q. Still bleeding. And when you met with the detectives, you didn't tell any of them that you were bleeding.
 {¶ 24} "A. It was obvious.
 {¶ 25} "Q. It was obvious.
 {¶ 26} "A. Yes.
 {¶ 27} "Q. So you had your arms open as such, having your palms facing up, and they were able to see that you were bleeding.
 {¶ 28} "A. They had to put handcuffs on me, so evidently they seen it.
 {¶ 29} "Q. So they put handcuffs on you, and did you indicate to them that you were in pain because you were cut?
 {¶ 30} "A. Yes, I did.
 {¶ 31} * * *
 {¶ 32} "Q. But you're still bleeding.
 {¶ 33} "A. It's an open wound.
 {¶ 34} "Q. But you're still bleeding.
 {¶ 35} "A. It's an open wound. [Repetition of question and answer in original.]
 {¶ 36} * * *
 {¶ 37} "Q. Did any of the — did you tell any of the correction officers that you were bleeding?
 {¶ 38} "A. It's on file over in the Montgomery County jail, the situation. They had me on suicide watch when I first came in."
 {¶ 39} In rebuttal, Saunders testified that he did not see any blood during the interview, that there were no blood smears on the Miranda warning Peck signed, or on his written statement, and that there was no indication that Peck was in pain. Saunders further testified that Peck's manner of speech and manner of walking were both the same during the interview as they were at the suppression hearing. Finally, Saunders testified concerning the suicide watch claim, as follows:
 {¶ 40} "Q. Detective Saunders, if he was under a suicide watch, would you have been notified, or would the case detective been notified to what was going on?
 {¶ 41} "A. I'm pretty sure that the jail would have notified —
 {¶ 42} "MR. REZABEK [representing Peck]: Objection, speculation.
 {¶ 43} "THE COURT: Overruled.
 {¶ 44} "THE WITNESS: I'm pretty sure that the jail would have notified the detectives that were taking them out of the building. Because if he's under a suicide watch, we would be responsible for him, as well will the jail, because he's still being housed. He was not being held on our charges. He was actually Dayton's arrest.
 {¶ 45} "So that information would have been — should have been passed on if it were so.
 {¶ 46} "BY MS. DROESSLER [representing the State]:
 {¶ 47} "Q. Is that the procedure over at the jail?
 {¶ 48} "A. As far as passing that information on?
 {¶ 49} "Q. As far as an individual if they're on suicide watch, is that the jail's procedure?
 {¶ 50} "A. If there is — if there is a likelihood of a person being dangerous or possibility of them committing physical harm to themselves, yes, they will pass that information on.
 {¶ 51} "Q. And as far as you're aware of, none of that was provided or no information like that.
 {¶ 52} "A. As far as I know, no."
 {¶ 53} Based upon the record, we conclude that the trial court could reasonably have found Peck's testimony not to be worthy of belief, and could reasonably have found the testimony of detectives Daugherty and Saunders to be credible, as the trial court evidently did. Armed with those findings, the trial court properly found Peck's statement to have been knowing and voluntary.
 {¶ 54} Peck's First Assignment of Error is overruled.
 III {¶ 55} Peck's Second Assignment of Error is as follows:
 {¶ 56} "APPELLANT'S TRIAL COUNSEL'S FAILURE TO REQUEST A CONTINUANCE OF THE SUPPRESSION HEARING AFTER A SUBPOENAED DEFENSE WITNESS FAILED TO APPEAR RENDERED COUNSEL INEFFECTIVE."
 {¶ 57} Peck bases this assignment of error upon the following statement by defense counsel after the State had rested at the suppression hearing, and before Peck called himself as his only witness:
 {¶ 58} "MR. REZABEK: Your Honor, I will have to check in the hallway. We did subpoena one person. Earlier she was not present.
 {¶ 59} "THE COURT: Okay.
 {¶ 60} "(Pause in proceedings.)
 {¶ 61} "MR. REZABEK: Your Honor, the witness that we had subpoenaed, although — we did — she is not present. But I will call Mr. Peck to the stand.
 {¶ 62} "THE COURT: All right."
 {¶ 63} The only aspect of this witness indicated in the record is her feminine gender. According to Daugherty and Saunders, only they, Detective Vitali, whose gender was indicated as masculine in Daugherty's testimony, and Peck were present during Peck's interview. Peck, who testified, did not contradict this. Therefore, the witness whom Peck intended to call was presumably not present during his statement, the voluntariness of which he is challenging.
 {¶ 64} It is nevertheless possible that the witness whom Peck intended to call at the suppression hearing could have provided testimony helpful to him. She might have corroborated his testimony that he had attempted to commit suicide, and was bleeding from a cut to his wrist either at the time of, or shortly before, his arrest. Because no proffer was made of this witness's testimony, the record does not demonstrate how her testimony would have been material to the suppression issue.
 {¶ 65} In a direct appeal, with respect to a claim of ineffective assistance of counsel, the record must demonstrate not only that counsel's performance fell below an objective standard of reasonableness, but also that the failure prejudiced the defendant. Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct 2052; State v. Bradley (1989), 42 Ohio St.3d 136, 538
N.E.2d 373. The record in this appeal fails to demonstrate how trial counsel's failure to have sought a continuance to procure the attendance of the missing witness, assuming, for purposes of analysis, only, that this failure fell below an objective standard of reasonableness, prejudiced Peck. The record fails to demonstrate prejudice, because it fails to indicate how the missing witness's testimony would have been material to Peck's defense in the suppression hearing.
 {¶ 66} Peck's Second Assignment of Error is overruled.
 IV {¶ 67} Both of Peck's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Brogan, and Wolff, JJ. concur.