[Cite as *State v. Rose*, 2012-Ohio-5607.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2011-11-214 |
| Plaintiff-Appellee, | : | O P I N I O N |
| | : | 12/3/2012 |
| - vs - | : | |
| | : | |
| JAMES E. ROSE, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2010-11-1841

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael A. Oster, Jr., Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Neal D. Schuett, 121 West High Street, Oxford, Ohio 45056, for defendant-appellant

**S. POWELL, P.J.**

{¶ 1} Defendant-appellant, James E. Rose, appeals his conviction and sentence in the Butler County Court of Common Pleas for rape, kidnapping, and assault.

{¶ 2} The testimony at trial revealed that in the early morning hours of November 7, 2010, Officer Kevin Ruhl responded to the Firehouse Café in Hamilton, Ohio, regarding a

reported sexual assault.[1] Upon his arrival, Officer Ruhl spoke with T.N. She was crying. "Her hands were shaking, and she had a real hard time getting her words out." T.N. told Ruhl that she was "raped and pulled or dragged to the area where the act took place." T.N. then led Officer Ruhl from the rear of the bar through a gap in a wooden enclosed fenced-in parking lot. T.N. stated that the rape occurred on the hood of a car located in the parking lot. Officer Ruhl stated that he could tell that there had been dust on the car, but it had been disturbed as though there had been some type of movement on top of the vehicle. T.N. explained that the perpetrator was a regular at the bar, but she did not know his name. However, she described the perpetrator as a white male dressed in jeans and a "white hoodie." Another officer, Officer Tom Hurst, reported that he had an individual in custody who matched the description of the suspect given by T.N. Officer Ruhl then transported T.N. to the location where she positively identified Rose as the person who raped her.

{¶ 3} Also during the early morning hours of November 7, 2010, Nicole Velde was walking with Chance Whitlock along High Street in Hamilton to a BP gas station to purchase cigarettes. On their way back from the gas station, the two encountered Rose. At trial, Velde testified that as she and Whitlock walked past Rose he asked if he could use one of their cellular telephones. Velde did not know Rose, but agreed to let him use her telephone. Velde and Whitlock followed behind Rose as he made his phone call. According to Velde, at some point, Whitlock received a phone call from his girlfriend and left Velde. Once Rose completed his call, he returned the telephone to Velde. At that time, Velde received a call from Whitlock telling her to "get away from [Rose] because the police were looking for him." Velde then attempted to head back to her apartment when Rose said to her, "no you're not, bitch, you are coming with me," and he grabbed her scarf and dragged her about three or

---

1. The record also refers to this location as "Bill's Firehouse Café." For ease of discussion, we will refer to it as the Firehouse Café.

four feet.  Velde, however, slid out of her scarf.  According to Velde, Rose then punched her in the nose, she fell to the ground, and he then ran away.  As a result of Rose's punch, Velde's nose and upper lip bled.  She did not go to the hospital or seek any other medical treatment.  Velde also identified Rose as her attacker that morning when Officer Tom Hurst brought Rose by her residence.  Velde identified Rose shortly after T.N. had identified him as the man who raped her.

{¶ 4}  Rose was arrested and indicted for rape in violation of R.C. 2907.02(A)(2), kidnapping in violation of R.C. 2905.01(A)(4), abduction in violation of R.C. 2905.02(A)(2), and assault in violation of R.C. 2903.13(A).  Counts one and two for rape and kidnapping related to Rose's encounter with T.N., and counts three and four for abduction and assault resulted from his interaction with Velde.  Prior to trial, Rose moved to sever counts one and two from counts three and four.  The trial court denied the motion.

{¶ 5}  On June 29, 2011, a jury trial commenced on all four counts.  The state made its opening statements and presented the testimony of T.N.  The following day, the trial judge, Judge Patricia Oney became incapacitated as a result of a medical emergency and was unable to proceed with the trial.  The administrative judge of the Court of Common Pleas General Division, Judge Charles Pater, after holding a hearing, declared a mistrial and ordered a new trial date be scheduled.  Following the mistrial, Rose filed an objection to the new trial date.  The objection was denied.  Rose then moved to dismiss the matter based on double jeopardy.  The court held a hearing, but ultimately denied the motion to dismiss.  A second jury trial commenced on August 31, 2011.

{¶ 6}  During a three-day jury trial, the state first presented testimony from T.N. and her boyfriend, Brad Coffey, who was also at the Firehouse Café that night.  The state then presented testimony from Velde and Whitlock as to the charges for abduction and assault.  Several of the responding officers from the City of Hamilton Police Department testified, as

- 3 -

well as Hamilton Police Detective Paul Davis. The jury also heard testimony from Charlene Wooten, a sexual assault nurse examiner with the Butler County Sexual Assault Nurse Examiner Program (SANE) and Adam Garver, a forensic scientist in the DNA Section of the Ohio Attorney General's Office, Bureau of Criminal Identification and Investigation. In his defense, Rose called multiple family and friends who were also at the Firehouse Café the night of November 6, 2010, and into the early morning hours of November 7, 2010.

{¶ 7} The jury ultimately found Rose guilty of the rape and kidnapping of T.N. and the assault of Velde, but not guilty of the abduction of Velde. On November 8, 2011, the trial court imposed an aggregate sentence of 15 years. Rose now appeals asserting seven assignments of error for our review.

{¶ 8} Assignment of Error No. 1:

{¶ 9} THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELANT BY OVERRULING HIS MOTION TO SEVER COUNTS ONE AND TWO FROM COUNTS THREE AND FOUR.

{¶ 10} In his first assignment of error, Rose challenges the trial court's ruling denying his motion to sever. Rose contends the cumulative effect of joining the offenses at trial allowed the evidence of the rape and kidnapping involving T.N. to prejudice the jury regarding the assault and abduction of Nicole Verde. We find Rose's arguments are without merit.

{¶ 11} The decision to grant or deny a motion to sever is a matter in the trial court's discretion, and therefore, we review the trial court's decision under an abuse of discretion standard. *State v. Moshos*, 12th Dist. No. CA2009-06-008, 2010-Ohio-735, ¶ 76. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130.

{¶ 12} "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160,

163 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340 (1981). However, a defendant is allowed, under Crim.R. 14, to move to sever offenses that have otherwise been properly joined where it appears that joinder would be prejudicial. *State v. Ashcraft*, 12th Dist. No. CA2008-12-305, 2009-Ohio-5281, ¶ 14, citing *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992).

{¶ 13} To prevail on a claim that the trial court erred in denying a motion to sever, the appellant must affirmatively demonstrate that "(1) his rights were prejudiced, (2) he provided the trial court with sufficient information enabling it to weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) the trial court abused its discretion in refusing to separate the charges for trial." *Ashcraft* at ¶ 15, citing *Schaim* at 59.

{¶ 14} The state may negate a claim of prejudice in one of two ways. The first is through the "other acts" test, where the "state must demonstrate it could have introduced evidence of the joined offenses at separate trials, pursuant to the "other acts" provision of Evid.R. 404(B)". *Ashcraft* at ¶ 16, citing *Lott* at 163. Alternatively, under the "joinder test" the state can refute a claim of prejudice by showing "that evidence of each crime joined at trial is simple and direct." *Moshos* at ¶ 79. If the state can establish that the evidence is "simple and direct" then there is no need to meet the stricter "other acts" test. *State v. Hensley*, 12th Dist. No. CA2009-11-156, 2010-Ohio-3822, ¶ 40. In other words, "[a] showing by the state that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper." *Moshos* at ¶ 80, quoting *State v. Bice*, 12th Dist. No. CA2008-10-098, 2009-Ohio-4672, ¶ 53.

{¶ 15} In the present case, the trial court determined joinder was permissible as the evidence was simple and direct. Prior to making this determination, the trial court held a hearing where it heard testimony from both victims in this case. Based on the testimony presented at the hearing, the court stated:

> I haven't heard anything that indicates to me that this evidence is

> not simple and direct.  It certainly is.  * * *
>
> There's no basis for a jury to be confused.  * * * We have in front of us two adults testifying about two separate incidents that occurred within a reasonable short period of time with some similarities.  And that is the act of violence as you say, Mr. Adams, the act of force being used on each, the attempt – the act of physically dragging in the first victim into an area where she could be sexually assaulted and the attempt to drag a second victim who got away.
>
> Based upon what I heard, I haven't heard anything that demonstrate[s] that this Court should sever.

{¶ 16} We agree with the conclusion of the trial court that the evidence in this case was simple and direct such that Rose was not prejudiced by the joinder of the offenses in one trial.

{¶ 17} At trial, during its opening and closing statements, the state presented an organized, chronological overview of the facts as to each of the offenses alleged by the two victims.  *See Moshos* at ¶ 82; *Ashcraft* at ¶ 20.[2]  During trial, the state presented the testimony of each victim who provided detailed testimony as to her interactions with Rose on the night in question.  *See Ascraft* at ¶ 21.  The remaining witnesses provided evidence that was victim specific and could easily be segregated and was unlikely to confuse the jury.  *See Moshos* at ¶ 82; *Ashcraft* at ¶ 23.

{¶ 18} Rose asserts that several witnesses, who were only testifying as to the abduction and assault of Velde, made numerous references to the rape allegations and that such references allowed the jury to "cumulate evidence of [the] jointly tried offenses." However, after reviewing the record, we find that only Whitlock and Officer Hurst specifically referred to the rape during their testimony relating to the charges involving Velde.  Whitlock

---

2. Specifically, during opening statements the prosecutor stated the following:

[T.N.] was raped.  She was kidnapped.  She was restrained of her liberty.  She was moved from one place to the other for the purpose of committing sexual – a sexual offense, and in this case, rape.  And 20 to 25 minutes later, he's on the west side of Hamilton where he abducts, tries to take – remove Nicole Velde from the place where she was, seven or eight feet.  He pulls her along, and being

stated during direct examination that the police stopped him, provided a description of Rose, and asked if he had seen him. Whitlock explained that the police told him that the man they were looking for was wanted for rape. However, the remainder of the testimony elicited from Whitlock was specific to Velde. Officer Hurst's testimony described the sequence of events prior to taking Rose into custody. He explained that after placing Rose under arrest, he was present when T.N. was brought to the scene and positively identified Rose as the person who raped her. Hurst then explained that a male came running up to him stating that Rose had assaulted his friend. He then transported Rose to another location where a female identified Rose as the person who assaulted her. Whitlock and Officer Hurst both referenced the rape while providing background information of the events that took place between the two incidents. We do not find that these references to the rape charge were enough to demonstrate that the jury improperly cumulated the evidence and relied on the evidence of the rape to convict on the charges relating to Velde. In fact, the jury acquitted Rose of the abduction of Velde. Such a finding demonstrates that evidence pertaining to each victim and each offense was easily segregated and did not confuse the jury.

{¶ 19} Furthermore, the trial court provided a limiting instruction to the jury that required it to consider the charges against Rose as separate matters. *See Moshos* at ¶ 84, citing *State v. Franklin*, 62 Ohio St.3d 118, 123 (1991). The court stated:

> The charges set forth in each count in the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately. And you must state your findings as to each count[,] uninfluenced by your verdict as to the other counts. The Defendant may be found guilty or not guilty of any one or all of the offenses charged. (Sic.)

---

unsuccessful in completing that, the mission of his abduction, and her ability to escape, assaults her by inflicting injury to her nose.

{¶ 20} A jury is presumed to have followed the trial court's instructions, and there is nothing in the record to indicate that the jury failed to do so in this case. *Moshos* at ¶ 88.

{¶ 21} Finally, Rose argues that he would have defended the offenses differently had the court granted the motion to sever; however, he fails to explain how he would have defended the charges differently had they been tried separately. A trial court does not abuse its discretion in denying a motion to sever where there is sufficient evidence to sustain each verdict and there is no indication that the defendant would have defended the charges differently had they been tried separately. *Moshos* at ¶ 83; *see also State v. Franklin*, 62 Ohio St.3d 118, 123 (1991). In this case, not only is there no indication that Rose would have defended the charges differently, the state presented extensive evidence detailing Rose's unwanted acts committed against both T.N. and Velde.

{¶ 22} Based upon the foregoing, we find the trial court did not err in denying Rose's request for severance where the evidence concerning each offense was simple and direct. Rose's first assignment of error is overruled.

{¶ 23} Assignment of Error No. 2:

{¶ 24} THE TRIAL COURT ERRED IN RETRYING THE DEFENDANT AS THE SECOND TRIAL WAS BARRED BY DOUBLE JEOPARDY WHEN THE FIRST TRIAL RESULTED IN A MISTRIAL.

{¶ 25} In his second assignment of error, Rose argues that the trial court erred in declaring a mistrial, and as a result, double jeopardy attached thereby barring his second trial. Rose asserts that there was not a manifest necessity to order a mistrial in this case because Crim.R. 25(A) permitted the trial to continue with a substitute judge. Rose further argues that the "record indicates that while the parties and the court knew a less prejudicial remedy existed in Crim.R. 25(A), no attempt was made to actually apply the rule." After a review of the record, we find no merit to Rose's arguments.

{¶ 26} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, applicable to the states via the Fourteenth Amendment, ensures that a state may not put a defendant in jeopardy twice for the same offense. *State v. Gunnell*, 132 Ohio St.3d 442, 2012-Ohio-3236, ¶ 25, citing *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056 (1969). The Double Jeopardy Clause also provides a criminal defendant with the right "to have his trial completed by a particular tribunal." *Gunnell* at ¶ 25, quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834 (1949). Accordingly, a defendant's rights under the Double Jeopardy Clause are frustrated by any mistrial. *Gunnell* at ¶ 25, citing *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824 (1978). However, there may be some situations where these rights are subordinated to the public's interest in fair trials and just judgments. *State v. Kersey*, 12th Dist. No. CA2008-02-031, 2008-Ohio-6890, ¶ 7.

{¶ 27} Where a mistrial has been declared without the defendant's request or consent, double jeopardy will not prohibit retrial if (1) there is a manifest necessity or a high degree of necessity for ordering a mistrial, or (2) the ends of public justice would otherwise be defeated. *Kersey* at ¶ 8, quoting *Widner* at 189-90; *see also Arizona v. Washington*, 434 U.S. 497, 98 S.Ct. 824. A trial court is afforded great discretion in determining whether a mistrial is appropriate as the trial court is in the best position to determine whether the situation warrants a mistrial. *Kersey* at ¶ 8, citing *State v. Glover*, 35 Ohio St.3d 18, 19 (1988). Therefore, a reviewing court may not reverse a trial court's decision to grant a mistrial absent an abuse of discretion. *State v. Motz*, 12th Dist. No. CA2009-10-137, 2010-Ohio-2170, ¶ 12.

{¶ 28} If the possibility of a mistrial arises due to the original judge's inability to complete a jury trial, one alternative to a mistrial is the use of a substitute judge. Crim.R. 25(A) addresses the use of a substitute judge before a verdict in a jury trial, and it states:

> If for any reason the judge before whom a jury trial has commenced is unable to proceed with the trial, another judge designated by the administrative judge * * * may proceed with

and finish the trial, upon certifying in the record that he has familiarized himself with the record of the trial. If such other judge is satisfied that he cannot adequately familiarize himself with the record, he may in his discretion grant a new trial.

{¶ 29} Although Crim.R. 25(A) permits the substitution of judges after trial has begun, substitution should be employed only in extraordinary circumstances where no prejudice results. *Kersey* at ¶ 9, citing *State v. McKinley*, 7 Ohio App.3d 255, 258 (8th Dist.1982). Additionally, the record "preferably, should stipulate that the defendant consents to the substitution." *McKinley* at 258. However, the defendant's consent is not required for the substitution to occur as long as the court fully complies with Crim.R. 25(A). *Id.*

{¶ 30} In this case, it appears that the possibility of a mistrial arose on the second day of Rose's jury trial when the original judge, Judge Oney, became incapacitated and it appeared that she was not going to be able to proceed for the next few days. The administrative judge, Judge Pater, held a hearing to determine whether the trial could continue in Judge Oney's absence. At this hearing, Judge Pater specifically discussed Crim.R. 25 with the parties.

{¶ 31} Judge Pater inquired as to whether the state and Rose consented to his substitution such that he would preside over the remainder of the trial. The state consented to Judge Pater presiding over the remainder of the trial, but Rose, through his counsel, stated that he did not consent to Judge Pater's substitution. Noting Rose's objection, the judge then explained that he did not feel that he was adequately familiar with the record of the case. Judge Pater also noted that he was only recently made aware of the charges in the case, he was not given a transcript of the testimony of the victim who had testified the day before, and he noted the sheer volume of the record. Apart from his "cautions about proceeding without the consent of the defendant," Judge Pater stated he did not feel adequately familiarized with the record. He therefore declared a mistrial and granted a new trial pursuant to Crim.R.

25(A).

**{¶ 32}** In both his motion to dismiss and argument on appeal, Rose attempts to characterize his lack of consent to the use of a substitute judge as an objection to Judge Pater's failure to follow the requirements of Crim.R. 25. However, Rose's argument on appeal is not the same argument he presented at the hearing declaring a mistrial.

**{¶ 33}** Immediately after the trial court declared a mistrial, defense counsel placed his reasoning for his lack of consent on the record:

> I want to make the record clear that one of the basis for that objection was the fact that, I believe, in order to adequately familiarize yourself with the record, you would have had to observe the demeanor of the State's witness, [T.N.], who was the complaining witness on the rape and kidnapping, and two most serious charges that my client faces.
>
> There is no way that you could have been able to actually achieve that because we don't have the video here where you would have been able to observe her demeanor, and heard her testimony and her interactions with the exhibits, and that's one of the basis for our lack of consent.
>
> The other one is, Your Honor, that from our standpoint, we have a number of witnesses that we had scheduled to testify. One of those witnesses we know would not be available tomorrow, which is essentially when we would now be able to put our case on.  * * * and that was another reason why we withdrew our consent.

**{¶ 34}** As the record illustrates, Rose objected to Judge Pater's substitution as he felt that the judge could not become adequately familiar with the record as he was unable to observe T.N.'s testimony. Furthermore, Rose argued that he would be prejudiced if the case continued with Judge Pater presiding as it would effectively prevent him from presenting certain witnesses' testimony due to scheduling issues. Rose did not argue that Judge Pater should not sit as a substitute judge because he had failed to comply with Crim.R. 25. Instead, he objected to the judge's substitution as a whole and, in effect, requested the judge declare a mistrial.

{¶ 35} The double jeopardy clause does not bar a retrial when the trial court grants a criminal defendant's request for a mistrial. *State v. Leece*, 12th Dist. CA89-06-084, 1990 WL 49993, *2 (Apr. 23, 1990), citing *Oregon v. Kennedy*, 456 U.S. 66, 672-673, 102 S.Ct. 2083 (1982). Similarly, the double jeopardy clause does not bar a retrial when the defendant acquiesces, but does not specifically request a mistrial and the substitute judge finds that he is unable to comply with Crim.R. 25(A). After a review of the record, we find that Rose acquiesced to the mistrial. At the time the parties were discussing the mistrial and when Judge Pater granted the mistrial, Rose did not voice any objection. He also did not object when the judge requested the parties to reschedule the trial. In fact, Rose's counsel indicated that Judge Oney's secretary would have a calendar in which they could tentatively set a three-day trial. Rose waited until July 8 – eight days after the trial court declared the mistrial – to object to the new trial. He cannot now argue on appeal that it was in error for the judge to declare a mistrial as that is exactly what he requested the judge to do.

{¶ 36} Furthermore, we find that the trial court did not abuse its discretion in finding there was a manifest necessity for declaring the mistrial. The record illustrates that the trial court's reasoning for granting this mistrial was to protect Rose's right to a fair trial. Judge Pater found that he was unable to adequately familiarize himself with the entire record as required by Crim.R. 25(A). Additionally, Rose indicated that he would be further prejudiced by the continuation of the trial with Judge Pater presiding as it would result in scheduling conflicts for his witnesses. Therefore, we find that the trial court did not abuse its discretion in finding that his substitution and the resulting continuation of the trial would prejudice Rose.

{¶ 37} Based upon our findings that Rose acquiesced to the mistrial and that the trial court did not abuse its discretion in declaring a mistrial, we find that Rose's second trial was not barred by double jeopardy. Accordingly, Rose's second assignment of error is overruled.

{¶ 38} Assignment of Error No. 3:

{¶ 39} THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN OVERRULING HIS OBJECTION TO THE ADMISSION OF HEARSAY STATEMENTS INTO EVIDENCE.

{¶ 40} In his third assignment of error, Rose challenges the admission of a portion of Exhibit 14, the sexual assault report completed by Charlene Wooten, the SANE nurse examiner. The report contained a transcription of statements T.N. made during Wooten's examination of her on November 7, 2010. On appeal, Rose only challenges the transcription of T.N.'s statements contained within the exhibit. Rose argues that the statements T.N. made during the examination were hearsay and were not made for the purposes of medical diagnosis or treatment, and therefore did not fall within the hearsay exception under Evid.R. 803(4).

{¶ 41} As the trial court possesses broad discretion with respect to the admission or exclusion of evidence, a reviewing court applies an abuse of discretion standard. *State v. Gray*, 12th Dist. No. CA2011-09-176, 2012-Ohio-4769, ¶ 39, citing *State v. Robb*, 88 Ohio St.3d 59, 68 (2000). Hearsay is an out of court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). Generally, hearsay is not admissible unless the statement falls under some exception to the hearsay rule. Evid.R. 802. Evid.R. 803(4) allows, as an exception to the hearsay rule, the admission of statements that are made for medical treatment or diagnosis. *State v. Wagers*, 12th Dist. CA2009-06-018, 2010-Ohio-2311, ¶ 51. Pursuant to Evid.R. 803(4), "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible.

{¶ 42} In sexual assault cases such as the case at bar, there is often testimony from a sexual assault nurse. Similar to the dual role of a social worker interviewing a child who may

be a victim of sexual abuse, these nurses often perform a dual role involving both medical diagnosis and treatment and the investigation and gathering of evidence. *See State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 33 (acknowledging the dual role of the social worker in interviewing a child who may be a victim of sexual abuse from both an investigatory and medical perspective). Only those statements made for the purpose of diagnosis and treatment are admissible under Evid.R. 803(4). *See Arnold* at ¶ 28; *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 47. Accordingly, the salient inquiry when determining whether a hearsay statement is admissible under Evid.R. 803(4), is whether the statement was made for purposes of diagnosis or treatment rather than for some other purpose. *See Muttart* at ¶ 47. One such "other purpose" is the gathering of forensic information to investigate and potentially prosecute a defendant. *Arnold* at ¶ 33. To the extent that a victim's statement to a nurse is for investigative purposes in furtherance of such criminal prosecution, the statements will not fall within the hearsay exception under Evid.R. 803(4). Rather, such statements are considered "testimonial" and implicate the Confrontation Clause. *Arnold* at ¶ 28, citing *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, ¶ 2.

{¶ 43} During trial, Wooten explained that:

> the purpose of a sexual assault nurse examiner is to collect specimens that is [sic] requested by the State attorney general's office kit along with the BCI, which is the crime lab up in London. They form a kit, and we collect specimens for that kit along with any type of history and everything from any patient who comes in saying that she was assaulted. * * * We are there only to collect the specimens, and to listen to her story and chart everything down verbatim as she tells us.

{¶ 44} Wooten explained that she is not there to counsel the victim. Wooten testified that she explains her purpose and the purpose of the kit to the victim and then she obtains the victim's consent to collect any type of specimens that are required for the kit. Wooten explained that she takes a "history from the patient" and that this must be written down

verbatim. Wooten further explained that she also asks whether there was any penile penetration in the vagina or if there was any other object inserted in the vagina or rectal area, and whether or not the victim had scratched or hit the perpetrator as this would "be passed onto the police to help identify" the perpetrator.

{¶ 45} Wooten did not testify as to the contents of the narrative in her report that she took from T.N. that night. However, Wooten's report, including T.N.'s narrative, was admitted as an exhibit. The narrative stated, in pertinent part: "He grabbed me by my hair and pulled me across the parking lot and took me to a car lot. He undid my belt buckle and pulled my [sic] down. I told him to stop. Then he took his penis out and put it inside of me. I was standing and he pushed me up against a car. Then he pulled me onto the ground. I kept telling him to stop but he wouldn't."

{¶ 46} Based on Wooten's testimony, it appears that her role was merely for investigative and evidence gathering purposes. Specifically, when the state asked whether she provides counsel for the victim she answered in the negative. Furthermore, from Wooten's testimony it appears that she explained, and T.N. would have understood, that her purpose of performing the examination and collecting specimens for the kit was to help the police "identify" and potentially later prosecute the perpetrator. Additionally, as Rose is only challenging T.N.'s narrative, we can find little evidence to suggest that this statement aided in any sort of diagnosis or medical treatment of T.N. Rather, after a review of the narrative, the details provided by T.N., such as where the rape took place, how the perpetrator forced her to the parking lot, and that she asked him to "stop," were not for the purpose of medical treatment, but rather relate primarily to the investigation of Rose. Based on the foregoing, we are obligated to find that the narrative contained within Wooten's report would not fall within the hearsay exception under Evid.R. 803(4). However, this is not meant to say that all reports and narratives by SANE nurses will be considered inadmissible hearsay. In this case

and on these facts, we cannot say that the narrative was for the purposes of diagnosis or treatment, but rather the statement was for investigative purposes. Accordingly, we find that the trial court's admission of Wooten's report, without redacting T.N.'s narrative statement was in error. However, as discussed below, the admission of these hearsay statements did not violate Rose's confrontation rights, and otherwise constituted harmless error, therefore we do not find that reversal is required.

{¶ 47} Although not argued by Rose, the testimonial nature of the improperly admitted hearsay statements by T.N. raises the issue of the Confrontation Clause. In this case, however, T.N., the declarant, testified at trial and was subject to cross-examination. Therefore, Rose was able to cross-examine T.N. and his confrontation rights were not violated. *See State v. Gray*, 12th Dist. No. CA2011-09-176, 2012-Ohio-4769, ¶ 48 (noting that when the declarant is present at trial and subject to cross-examination, the Confrontation Clause presents no constraints on the use of the prior testimonial statement). Moreover, Wooten was also present at trial and Rose was entitled to cross-examine Wooten on her transcription of T.N.'s statements.

{¶ 48} Additionally, the error in admitting the narrative of T.N. contained in Exhibit 14 was harmless pursuant to Crim.R. 52(A), as it was merely cumulative to the admissible testimony of T.N. *State v. Kingery*, 12th Dist. CA2009-08-014, 2010-Ohio-1813, ¶ 35, citing *State v. Fears*, 86 Ohio St.3d 329 (1999) (witness' testimony was cumulative and constituted harmless error because the error did not contribute to the verdict). T.N. took the stand and provided substantial testimony regarding the events of the night including what she detailed to Nurse Wooten. Further, the defense conducted a substantial cross-examination as to T.N.'s multiple statements regarding her interaction with Rose. Accordingly, the jury was able to independently assess her credibility. *State v. Cappadonia*, 12th Dist. No. CA2008-11-138, 2010-Ohio-494, ¶ 20. As a result, it cannot be said that the result of the trial would have

been otherwise absent the inclusion of the narrative contained in Wooten's report. We therefore find that the trial court's error in admitting the narrative in Exhibit 14 was harmless. Rose's third assignment of error is overruled.

{¶ 49} Assignment of Error No. 4:

{¶ 50} THE TRIAL COURT ERRED AND DENIED APPELLANT A FAIR TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN IT LIMITED COUNSEL'S OPPORTUNITY TO PRESENT A CLOSING ARGUMENT PRIOR TO THE JUDGMENT OF THE JURY TRIAL.

{¶ 51} Rose argues in his fourth assignment of error that the trial court erred when it placed a time constraint on his closing arguments.

{¶ 52} "It is well established that the time allowed for closing argument is within the sound discretion of the trial court." *State v. Jenkins*, 15 Ohio St.3d 164, 221 (1984). The trial court is entitled to limit closing arguments as long as such limitation is reasonable under the circumstances. *State v. Ferrette*, 18 Ohio St.3d 106, 110 (1985). Accordingly, we will not reverse the trial court's decision limiting closing arguments absent an abuse of discretion. *State v. Parrot*, 12th Dist. No. CA97-11-114, 1998 WL 526545, *2 (Aug. 24, 1998).

{¶ 53} The record reveals that during an objection to defense counsel's closing argument, the trial court inquired how much longer the argument would take. Counsel responded that he had "a lot to work with" and still had "a while" as he had not even discussed the third and fourth counts regarding Velde. The court responded, "[t]his is a half-hour. It is done when you are done." The record indicates that counsel continued his argument at 11:17 a.m. and voluntarily concluded at 11:42 a.m. Therefore, it appears that counsel did not utilize the full 30 minutes given by the trial court. There is also nothing in the record to suggest that counsel was in any way prevented from presenting a full closing argument. Accordingly, we are unconvinced that the trial court abused its discretion when it

- 17 -

placed a time limit on the remainder of counsel's closing argument. Moreover, counsel voiced no objection to the trial court's imposition of a 30-minute limitation, but rather he simply continued with his closing argument and voluntarily concluded before the expiration of the 30 minutes. Thus, Rose waived his right to object to this alleged error. *Ferrette* at 110.

{¶ 54} Rose's fourth assignment of error is overruled.

{¶ 55} Assignment of Error No. 5:

{¶ 56} THE MANIFEST WEIGHT OF THE EVIDENCE DID NOT SUPPORT A FINDING OF GUILT AGAINST DEFENDANT-APPELLANT FOR RAPE AND KIDNAPPING.

{¶ 57} In his fifth assignment of error, Rose challenges his convictions for rape and kidnapping claiming they were against the manifest weight of the evidence.

{¶ 58} A manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Marcum*, 12th Dist. No. CA2012-03-054, 2012-Ohio-5007, ¶ 11. A court considering whether a conviction is against the manifest weight of the evidence must review the entire record, weigh the evidence and all reasonable inferences and consider the credibility of the witnesses. *State v. Bryant*, 12th Dist. No. CA2009-11-277, 2010-Ohio-4801, ¶ 13, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 39. Although this type of review permits a reviewing court to consider the credibility of witnesses, the review must nevertheless be tempered by the principle that weight and credibility issues are primarily matters for the trier of fact to decide. *State v. Kash*, 12th Dist. No. CA2002-10-047, 2004-Ohio-415, ¶ 25, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Consequently, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 59} Rose was convicted of one count of rape, pursuant to R.C. 2907.02(A)(2), which states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Rose was also charged with kidnapping, in violation of R.C. 2905.01(A)(4), which states in pertinent part: "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will." Sexual activity includes vaginal intercourse between a male and female. R.C. 2907.01(A)(C).

{¶ 60} Rose's argument that his conviction is against the manifest weight of the evidence is premised upon the assertion that T.N.'s testimony was not credible as she was impeached on multiple occasions through inconsistent statements. He alleges that the greater weight of the evidence suggested a consensual sex act occurred between him and T.N. Specifically, he argues that the physical evidence did not support the convictions for rape and kidnapping, but rather the evidence was "equally consistent with consensual sexual relations."

{¶ 61} T.N. testified on direct examination that sometime after midnight, Rose motioned for her to go outside. T.N. complied and followed Rose outside. When she exited the bar, Rose was standing there; he grabbed her hair, and put his hand over her mouth. He told her not to scream. T.N. explained that Rose then "forced her over to the parking lot" which contained broken down cars. According to T.N., this parking lot was "a little ways away from the bar" and Rose pushed her through a gap between a chain linked fence and a privacy fence that separated the parking lot from the area where the bar was located. Once the two arrived at this parking lot, T.N. testified that Rose pushed her against the hood of a car, pulled her pants and underwear down to her ankles, and then penetrated her vagina with

his penis. She says Rose then turned her over on her stomach on the hood of the car, and again penetrated her. Navey says that she did not scream or fight back at this point but cried because she "didn't want to get hurt." Rose then put her on the ground and penetrated her again. After headlights shined through the fence, T.N. testified that Rose said, "oh shit," got up and took off towards High Street in Hamilton.

{¶ 62} After reviewing the record, it is clear that there were some inconsistencies in several of the details provided by T.N. as to her encounter with Rose that night. For example, there appears to be some inconsistency as to which penetration occurred first, whether her hair was down or in a ponytail, whether she had met or talked to Rose previously, or whether she was sitting or standing when Rose pulled down her pants. While these facts may create a conflict in the evidence or call into question T.N.'s credibility, the credibility of the witnesses and weight to be given to their testimony are ultimately matters for the trier of fact to resolve. *State v. Amburgey*, 12th Dist. No. CA2005-01-007, 2006-Ohio-1000, ¶ 6, citing *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). The jury was free to believe all, part of, or none of T.N.'s testimony. *See State v. Widmer*, 12th Dist. No. CA2011-03-027, 2012-Ohio-4342, ¶ 107.

{¶ 63} Although corroborating evidence of a victim's testimony is not required in a rape case, a review of the record provides additional evidence the jury could have relied upon in finding Rose guilty of kidnapping and raping T.N. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 53.

{¶ 64} Several witnesses testified to seeing Rose and T.N. exit the bar around the same time. As mentioned above, T.N. testified that Rose "dragged her" from the bar through a privacy fence over to an adjacent parking lot. Detective Davis estimated that the distance between the bar and this parking lot was about 75 yards. Davis also testified he noted that frost on the car which T.N. identified as where the rape occurred had been disturbed. He

testified that "the striations in [the frost] indicated that there had been some movement on the hood of this car." A photograph of the hood of this car was entered into evidence.

{¶ 65} Upon T.N.'s return to the bar, she testified that she told her grandmother she had just been raped. T.N. then called 911 to report the assault. A tape of the 911 call was played for the jury. On the tape, T.N. can be heard crying. Additionally, several witnesses testified as to her demeanor at that time. Her boyfriend, Brad Coffey, testified that "she was curled up in a ball on the steps hysterical and screaming that she had been raped." The officer responding to the scene described T.N. as "obviously shaken up. She was crying. Her hands were shaking, and she had a real hard time getting her words out."

{¶ 66} Wooten testified regarding her examination of T.N. at the hospital that night. Wooten explained that she found debris in the peritoneal area, but found no other injuries to the vaginal or anal area. She testified that the lack of injuries to the vaginal or anal area of the body is not uncommon in a sexual assault if there is a lot of alcohol consumed because the "muscles relax with the alcohol intake, so you don't always see tears and cuts to the actual orifice." There was testimony that T.N. consumed several drinks that night. Additionally, forensic evidence confirmed that a sexual encounter occurred between T.N. and Rose. Adam Garver, a Forensic Scientist in the DNA Section of the Ohio Attorney General's Office, Bureau of Criminal Identification and Investigation testified that penile swabs taken from Rose contained a mixture of DNA which was consistent with contributions from both Rose and T.N. Garver also testified that Rose's DNA was found in sperm cells taken from a sample cutting of T.N.'s underwear.

{¶ 67} Based on the foregoing evidence and testimony, we cannot say that the jury clearly lost its way so as to create a manifest miscarriage of justice requiring Rose's convictions for kidnapping and rape to be reversed. Accordingly, Rose's fifth assignment of error is overruled.

{¶ 68} Assignment of Error No. 6:

{¶ 69} THE TRIAL COURT ISSUED A SENTENCE CONTRARY TO LAW, TO THE PREJUDICE OF THE APPELLANT, BY IMPOSING A MAXIMUM PENALTY AND CONSECUTIVE PRISON TERM.

{¶ 70} In his sixth assignment of error, Rose challenges the sentence imposed by the trial court. He argues that the court did not have jurisdiction to hold three sentencing hearings. Furthermore, he argues that his sentence is contrary to law as the court imposed a "maximum penalty" and did not provide the proper findings under R.C. 2929.14(C)(4) to impose consecutive terms of imprisonment. Alternatively, Rose argues that his "sentence was an abuse of discretion." We find no merit to these arguments.

## A. Jurisdiction

{¶ 71} The trial court held an initial sentencing hearing on October 24, 2011. At this hearing, the trial court heard from Rose, his attorney and several family members. After considering these statements and the presentence investigation report, the trial court announced a sentence consisting of 10 years for rape, 5 years for kidnapping, which were to be served consecutively to each other, and 180 days for assault, to be served concurrently to the 10 years Rose received for rape. Rose was also fined $1,600, ordered to pay the costs of prosecution, and given 352 days of jail time credit. However, the trial court, with the agreement of the parties, continued the sentencing hearing to October 27, 2011, to complete certain requirements related to Rose's sexual offender registration classification. During the October 27, 2011 hearing, the trial court explicitly stated that the hearing was a "continuation of sentencing in this case." Rose did not object to this hearing. The trial court then informed Rose of his reporting requirements as a Tier III sex offender and obtained his signature on a form explaining these same responsibilities. The trial court also reiterated the sentence announced on October 24, 2011, and advised Rose of the applicable postrelease control

conditions and his right to appeal.

**{¶ 72}** The trial court did not file a judgment of conviction entry relating to the two October sentencing hearings. Rather, on November 1, 2011, another sentencing hearing was held. The sentencing transcript indicates that the purpose of this was to comply with "House Bill 86 * * * to ensure that certain findings if the Court imposes consecutive sentences – certain findings are made." At this hearing, Rose's counsel voiced an objection arguing that the hearing was unnecessary as the trial court had already held two sentencing hearings and "entered a judgment and made its findings of facts and conclusions of law." The trial court then considered the purpose of sentencing as reflected in the amended sentencing statutes and stated that it would consider the statements made during the October 24, 2011 hearing. The trial court sentenced Rose to the same sentence it announced during the October 24, 2011 hearing, added new findings to the record, and provided additional jail-time credit. On November 8, 2011, for the first time, the trial court filed a judgment of conviction entry detailing Rose's sentence.

**{¶ 73}** The trial court had jurisdiction to hold the sentencing hearings on October 27, 2011, and November 1, 2011. A trial court lacks the authority to reconsider its own valid final judgments in criminal cases. *State v. Staley*, 12th Dist. No. CA2006-10-045, 2007-Ohio-3154, ¶ 11, citing *State ex rel. Cruzado v. Zaleski*, 111 Ohio St.3d 353, 2006-Ohio-5796, ¶ 18. It therefore follows, that the trial court retains the authority to reconsider those judgments that are not final. To constitute a final judgment in a criminal case, a judgment of conviction must sets forth "(1) the guilty plea, the jury verdict, or the finding of the court upon which the conviction is based; (2) the sentence; (3) the signature of the judge; and (4) entry on the journal by the clerk of court." *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, ¶ 18.

**{¶ 74}** In the present case, there was only one judgment of conviction and it was entered after the November 1, 2011 hearing. On November 8, 2011, the trial court filed an

- 23 -

entry which included the jury's finding Rose guilty of rape, kidnapping, and assault, the sentence, and it is signed by the judge. There are no other entries in the record that were filed after either of the October hearings. As such, there was no final judgment in this case until November 8, 2011. The trial court was free to reconsider its sentence of Rose up until the judgment of conviction entry was filed. Accordingly, the trial court had the authority and jurisdiction to hold the hearings on October 27, 2011, and November 1, 2011. Therefore, the trial court retained jurisdiction to modify the sentence.

{¶ 75} Rose also argues that he was prejudiced by having three sentencing hearings as his family was not present to offer statements in mitigation. It is clear from the record that the second hearing held on October 27, 2011, was merely a continuation of the hearing on October 24, 2011, and therefore it would have been unnecessary for the family to be present at that hearing. As to the hearing on November 1, 2011, the trial court made it clear that it would consider all statements, including those made by Rose's family, when imposing his sentence. Accordingly, we can find no prejudice in the trial court holding two additional sentencing hearings.

### B. Sentencing Factors

{¶ 76} Rose also argues in his sixth assignment of error that his sentence is contrary to law as the court improperly imposed a maximum penalty and ordered him to serve consecutive terms of imprisonment. We note that on September 30, 2011, the General Assembly enacted 2011 Am.Sub.H.B. No. 86 (H.B. 86) which revised several sentencing statues. As Rose was sentenced on November 8, 2011, we find that this legislation is applicable to him.

{¶ 77} Appellate courts apply a two-step procedure when reviewing felony sentences. First, courts must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and

convincingly contrary to law. *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, ¶ 26. If this first prong is satisfied, then the sentencing court's decision is reviewed for an abuse of discretion. *Id.* at ¶ 4; *State v. Blanton*, 12th Dist. No. CA2008-09-235, 2009-Ohio-3311, ¶ 18.

{¶ 78} In applying the first prong of the test outlined in *Kalish*, a trial court must consider the statutes that are specific to the case itself. *State v. Bishop*, 12th Dist. No. CA2010-08-054, 2011-Ohio-3429, ¶ 15, citing *Kalish* at ¶ 13; *Kalish* at ¶ 14. A sentence is not clearly and convincingly contrary to law where the trial court considers the purposes and principles of sentencing under R.C. 2929.11, as well as the seriousness and recidivism factors listed in R.C. 2929.12, properly applies postrelease control, and sentences a defendant within the permissible statutory range. *State v. Elliott*, 12th Dist. No. CA2009-03-020, 2009-Ohio- 5926, ¶ 10, citing *Kalish* at ¶ 18. Through H.B. 86, the General Assembly amended R.C. 2929.11 and it now states that the "overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." Even in light of these changes made by H.B. 86, there is still no "mandate" for the sentencing court to engage in any factual findings under R.C. 2929.11 or R.C. 2929.12. *State v. Putnam*, 11th Dist. No. 2012-L-026, 2012-Ohio-4891, ¶ 9, citing *State v. Foster*, 109 St.3d 1, 2006-Ohio-856, ¶ 42. Rather, the trial court still has discretion to determine whether the sentence satisfies the overriding purpose of Ohio's sentencing structure. R.C. 2929.12(A).

{¶ 79} The judgment entry of conviction clearly indicates that the trial court considered "the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and has balanced the seriousness and recidivism factors of Ohio Revised Code Section 2929.12." Furthermore, at the November 1, 2011 sentencing hearing the trial court specifically referenced the purposes of sentencing as set forth in the newly amended R.C.

2929.11.  The transcripts from the hearing on October 24, 2011, and November 1, 2011, also indicate that the trial court considered certain factors under R.C. 2929.12.  Furthermore, Rose was sentenced within the applicable statutory range.  Rose was convicted of rape, in violation of R.C. 2907.02(A)(2) and kidnapping, in violation of R.C. 2905.01(A)(4).  Both of these offenses are first-degree felonies.  R.C. 2907.02(B); R.C. 2905.01(C)(1).  The available prison term for a felony in the first degree is 3 to 11 years.  R.C. 2929.14(A)(1).[3]  As Rose was sentenced to 5 years for kidnapping and 10 years for rape his sentence was well within the permissible statutory range.  The trial court also advised Rose of the applicable postrelease control issues.  However, our inquiry as to whether Rose's sentence is clearly and convincingly contrary to law does not end here.

{¶ 80} H.B. 86 has added an additional requirement that trial courts must adhere to when imposing consecutive sentences.[4]  In enacting H.B. 86, the General Assembly revived the requirement that trial courts make certain factual findings before imposing consecutive sentences under R.C. 2929.14(C)(4).  S*tate v. Smith*, 12th Dist. No. CA2012-01-004, 2012-Ohio-4523, ¶ 20, citing *State v. Alexander*, 1st Dist. Nos. C-110828, C-110829, 2012-Ohio-3349, ¶ 13.[5]  The amended version of R.C. 2929.14(C)(4) now provides a three-step analysis before a trial court can impose consecutive sentences.  *Smith* at ¶ 21, citing *State v. Snyder*,

---

3.  H.B. 86 also amended the available prison term for first degree felonies from a maximum of 10 years to a maximum of 11 years.

4.  Prior to the enactment of H.B. 86, trial courts were given full discretion to impose a prison sentence within the statutory range and were not required to make findings or give reasons for imposing consecutive sentences.  *State v. Foster*, 109 St.3d 1, 2006-Ohio-856, at ¶ 100 .

5.  The First District has found and we agree that our determination as to whether a trial court has adhered to the applicable requirements of R.C. 2929.14(C)(4) in imposing consecutive sentences is subject to review under the first prong of *Kalish* and under R.C. 2953.08(G)(2).  *Alexander* at ¶ 14; *see also Kalish* at ¶ 14.  Pursuant to R.C. 2953.08(G)(2), a reviewing court may vacate consecutive sentences only if it "clearly and convincingly finds" either that the record does not support the trial court's R.C. 2929.14(C)(4) findings or that the sentence is otherwise contrary to law.  Moreover, in *Kalish*, the court noted that even though R.C. 2953.08(G)(2) refers to the excised fact-finding portions of the sentencing scheme the appellate court is precluded from applying an abuse-of-discretion standard when it initially reviews a sentence, rather the standard is whether the sentence is clearly and convincingly contrary to law.  *Kalish* at ¶ 14.  It therefore follows that even though certain judicial fact-finding portions have been revived by H.B. 86, the clearly and convincingly contrary to law standard would still apply.

3rd Dist. No. 13-11-37, 2012-Ohio-3069, ¶ 25. Pursuant to R.C. 2929.14(C), the trial court must find: (1) that consecutive sentencing is necessary to protect the public from future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the following applies:

> The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*Smith* at ¶ 21.

{¶ 81} In arguing that his sentence is contrary to law, Rose asserts that the "record lacks evidence that [he] was a danger to society and a maximum penalty and consecutive sentences were necessary to protect the public from future harm."

{¶ 82} Initially, we note that the trial court is not required to make any findings prior to imposing a maximum sentence. The prior version of R.C. 2929.14(C) required the trial court to make certain findings before imposing a maximum term of imprisonment. In *State v. Foster*, 109 St.3d 1, 2006-Ohio-856, the Supreme Court held this portion of the statute to be unconstitutional. *Id.* at paragraph one of the syllabus. Although the recently enacted H.B. 86 revised R.C. 2929.14, the General Assembly did not revive the former portions of R.C. 2929.14 which addressed maximum sentences. *See* Am.Sub.H.B. No. 86, Section 11.

Rather, R.C. 2929.14(C)(4) as amended only addresses consecutive sentences and does not mention maximum sentences. R.C. 2929.14(C)(4); *see also State v. Calliens*, 8th Dist. No. 97034, 2012-Ohio-703, ¶ 28. Furthermore, Rose did not receive the maximum penalty for either offense in this case. As discussed above, the permissible range of imprisonment for each of Rose's convictions was 3 to 11 years. He received five years for kidnapping and ten years for rape.

{¶ 83} As to the imposition of consecutive sentences, we find that the trial court complied with the dictates of the newly amended R.C. 2929.14(C)(4) and made all the required findings. Contrary to Rose's assertions, the record indicates that the trial court complied with the three-step analysis in R.C. 2929.14(C)(4) and found all of the statutory findings applicable. Specifically, during the November 1, 2011 hearing, the court stated:

> The Court is going to impose on Count One, rape, ten years * * * the Court is finding that consecutive sentences are necessary to punish the offender, and consecutive sentences are not disproportionate to the seriousness of the offender's conduct, and the danger that the offender poses to the public. And the offender has a history of criminal conduct and demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant.

{¶ 84} Moreover, although the trial court was not required to set forth its consecutive sentence findings in the sentencing entry, the trial court memorialized its findings in the judgment entry of conviction. *See* S*tate v. Smith*, 2012-Ohio-4523, ¶ 34 (finding that the trial court is not required to set forth its consecutive sentence findings pursuant to R.C. 2929.14(C)(4) in the sentencing entry). Based on the foregoing, Rose's sentence was not contrary to law as the trial court complied with all applicable statutes and rules.

{¶ 85} As to the second prong of *Kalish*, Rose only argues in passing that the trial court abused its discretion in imposing his sentence. He does not, however, argue how his sentence was an abuse of discretion. The record demonstrates that Rose had a criminal

history, lacked remorse, and committed two separate violent crimes. After a review of the record, we find no abuse of discretion.

{¶ 86} Rose's sixth assignment of error is overruled.

{¶ 87} Assignment of Error No. 7:

{¶ 88} THE TRIAL COURT ERRED WHEN IT FAILED TO MERGE APPELLANT'S CONVICTIONS FOR COUNT ONE AND COUNT TWO.

{¶ 89} In his seventh and final assignment of error, Rose argues that the trial court erred in convicting and sentencing him for both kidnapping and rape as these offenses are allied offenses of similar import and should have been merged at sentencing.

{¶ 90} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme court set forth a two-part test to determine if offenses are allied offenses of similar import under R.C. 2941.25. The court made clear that in applying this test, "the conduct of the accused must be considered." *Johnson* at ¶ 44. In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), a court must first determine "whether it is possible to commit one offense *and* commit the other with the same conduct." (Emphasis sic.) *Johnson* at ¶ 48; *State v. Stefanopoulos*, 12th Dist. No. CA2011-10-187, 2012-Ohio-4220, ¶ 48. In making this determination, it is not necessary that the commission of one offense would always result in the commission of the other, but instead, the question is simply whether it is possible for both offenses to be committed with the same conduct. *State v. Craycraft*, 193 Ohio App.3d 594, 2011-Ohio-413, ¶ 11 (12th Dist.), citing *Johnson* at ¶ 48. If it is found that the offenses can be committed by the same conduct, then a court must determine "whether the offenses were committed by the same conduct, *i.e.*, 'a single act, committed with a single state of mind.'" *Johnson* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio- 4569, ¶ 50. If both of these questions are answered in the affirmative, the offenses are allied offenses of similar import and must be merged. *Johnson* at ¶ 50.

However, if the commission of one offense will never result in the commission of the other, "or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." *State v. Standifer*, 12th Dist. No. CA2011-07-071, 2012-Ohio-3132, ¶ 66, quoting *Johnson* at ¶ 51.

{¶ 91} Applying *Johnson* to the facts present here, we must first determine if it is possible to commit both kidnapping and rape with the same conduct. *See Johnson* at ¶ 48. To be guilty of rape in violation of R.C. 2907.02(A)(2), the state had to prove that Rose engaged in sexual conduct with T.N. and purposely compelled her to submit by force or threat of force. To be guilty of kidnapping in violation of R.C. 2905.01(A)(4), the state had to prove that Rose, moved T.N. by force or restrained her liberty in order to engage in sexual activity against her will. The Ohio Supreme Court and this court have held that kidnapping, in violation of R.C. 2905.01(A)(2) and rape, in violation of R.C. 2907.02(A)(2), can constitute allied offenses of similar import. *State v. Mitchell*, 6 Ohio St.3d 416, 418 (1983); *State v. Ramirez*, 12th Dist. No. CA2010-11-305, 2011-Ohio-6531, ¶ 52, 59. We conclude that it is possible to commit the offenses of kidnapping and rape with the same conduct. Where, as here, a person forcibly restrains the victim in order to engage in sexual activity against the victim's will, this conduct would constitute both kidnapping and rape.

{¶ 92} We next determine whether Rose in fact committed kidnapping and rape by way of a single act, performed with a single state of mind, or whether he had separate animus for each offense. *Johnson* at ¶ 49, 51. In *Logan*, in establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus, the Ohio Supreme Court adopted the following guidelines:

> Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a

significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*State v. Logan*, 60 Ohio St.2d 126 (1979), syllabus. "The foregoing guidelines appear to remain valid in the wake of *Johnson*." *State v. McCullough*, 12th Dist. Nos. CA20110-04-006 and CA2010-04-008, 2011-Ohio-992, ¶ 20.

{¶ 93} Testimony at trial indicated that once T.N. exited the Café, Rose grabbed her by the hair, covered her mouth, and dragged her 75 yards to a parking lot containing broken down cars. Detective Davis described this parking lot as an "enclosed" car lot with secured fencing around it. According to Davis, there was a "chain-link fence that [ran] from the privacy fence westbound." In moving T.N. from the rear entrance of the Café to this parking lot, Rose forced T.N. through a gap between the chain-linked fence and the privacy fence. At trial, an aerial photograph depicting the area of the bar and this car lot was admitted as an exhibit. From this exhibit, it appears that another building's parking lot separated the car lot where the rape occurred from the area where the bar was located. Once Rose and T.N. reached the enclosed car lot, T.N. testified that Rose pushed her on top of the hood of a car and vaginally raped her twice, once while her back was on the hood and then again with her stomach on the hood of the car. Rose then pinned T.N. to the ground and vaginally raped her a third time.

{¶ 94} The indictment and bill of particulars indicate that the charge of kidnapping was based on both Rose's actions in restraining T.N. in order to engage in sexual activity with her against her will and for removing her from the place she was located in order to engage in sexual activity against her will. From the testimony provided at trial, it appears that the force

used to compel T.N. into the sexual acts, namely pinning her against the hood of the car and to the ground was the same as the force used to restrain her. Rose's restraint of T.N. was incidental to the underlying sexual crime and had no independent significance. The detention was no longer than the time necessary to complete the underlying sexual offenses. This was a single course of action, committed with a single state of mind. Therefore, the state could have relied upon the same conduct, *i.e.*, Rose's restraint of T.N., in convicting him of both rape and kidnapping.

{¶ 95} However, after reviewing the record, it appears that the state instead relied upon Rose's separate conduct in removing T.N. from the Café to the secured car lot in convicting Rose of kidnapping. Specifically, during closing arguments, the prosecutor stated: "The defendant is also charged with – indicted for committing the act of kidnapping. That's by force removing or restraining – in this case, it's removing a person from the place they are found." From the testimony described above, it is clear that the state's argument was supported by the testimony and evidence submitted to the jury.

{¶ 96} Furthermore, in applying the guidelines as set forth in *Logan* we find that Rose's actions in grabbing T.N. by the hair and dragging her 75 yards to the car lot demonstrate a separate animus for both crimes. The movement of T.N. was substantial. Not only did Rose move T.N 75 yards and through a gap between two fences, but he also had to drag her across another building's parking lot that separated the area between the bar and the car lot to reach the car where the rape ultimately occurred. Moreover, the confinement was secretive as Rose removed T.N. from the entrance of a crowded bar to an "enclosed" car lot containing broken down cars. Accordingly, we cannot say that Rose's use of force in removing T.N. from the rear of the Café to the parking lot and the use of force in compelling her into the sexual acts was a single course of action committed with a single state of mind. As such, we find that the kidnapping and rape were not allied offenses of similar import.

Therefore, the trial court properly sentenced Rose for kidnapping and rape under *Johnson* and R.C. 2941.25.

{¶ 97} Rose's seventh and final assignment of error is overruled.

{¶ 98} Judgment affirmed.


YOUNG, J., concurs.


RINGLAND, J., concurs separately.


**RINGLAND, J., concurring separately.**


{¶ 99}   I concur with the majority opinion, however, I write separately to address the trial court's decision to limit counsel's closing arguments.  I agree with the majority only because counsel did not object and was able to adapt to the court's decision, therefore rendering the error harmless.  However, such a decision could have very easily resulted in prejudicial error were this not the case.  Therefore, I find that the better practice would be for the trial court to set forth the perimeters and limitations of closing arguments prior to the parties beginning their arguments, rather than during.


Young, J., retired, of the Twelfth Appellate District, sitting by assignment of the Chief Justice, pursuant to Section 6(C), Article IV of the Ohio Constitution.