[Cite as *State v. Morsie*, 2014-Ohio-172.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                        :                    CASE NO.   CA2012-07-064

                                        :                    O P I N I O N

    - vs -                                                                   1/21/2014

                                          :

JESSIE LEE MORSIE,                            :

    Defendant-Appellant.                     :

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 12CR28074

David Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Kristopher Haines, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for defendant-appellant

    **S. POWELL, J.**

    {¶ 1}   Defendant-appellant, Jessie Lee Morsie, appeals from the conviction and sentence he received in the Warren County Court of Common Pleas after he was found guilty on four counts of sexual battery and one count of attempted rape.  For the reasons outlined below, we affirm in part, reverse in part and remand for further proceedings.

    {¶ 2}   On February 21, 2012, the Warren County grand jury returned an eight-count

indictment against Morsie alleging two counts of rape, two counts of attempted rape, three counts of sexual battery, and one count of disrupting public services. The charges stemmed from Morsie's unwanted sexual encounters with four women, M.T., D.B., A.S., and K.C., who he allegedly lured to his apartment between the summer of 2010 and March 20, 2011. The disrupting public service charge was subsequently dismissed. Thereafter, Morsie filed a motion to sever the remaining charges against him, which the trial court denied. The matter then proceeded to a bench trial.

{¶ 3} At trial, the state first called M.T. to testify. M.T testified she became ill after an unknown individual filled up her drink while she was socializing in the apartment of her friend, Timothy Willis. Upon learning M.T. was feeling sick, Morsie, who lived in the same apartment complex, agreed to help M.T. back to her own nearby apartment. M.T. had previously met Morsie when he took her into his apartment to show her his furniture. Believing Morsie was helping her back to her own apartment, M.T. left Willis' apartment with Morsie. According to M.T., she was "totally out of it" during this time and required Morsie's assistance to walk.

{¶ 4} M.T. then testified she immediately went to bed upon entering what she assumed was her own apartment. As M.T. testified, "I thought I was in my room and I was going to sleep, that's what I thought." However, later that evening as M.T. drifted in and out of consciousness, M.T. testified she awoke to find herself naked and in pain. M.T. then testified that she glanced back over her shoulder when she saw Morsie penetrating her vagina first with an unknown object, then with a "black dildo" sex toy, and finally with a beer bottle. Unable to move, M.T. testified she then "passed out" only to wake up the next morning in Morsie's apartment. When asked how she knew it was Morsie's apartment, M.T. testified she recognized Morsie's flowered couch he showed her on a previous visit.

{¶ 5} Continuing, M.T. testified she put on her clothes and snuck back to her own apartment. Once there, M.T. testified she took a shower and talked to Willis, who convinced

her to call police. M.T. also testified she later confronted Morsie about his actions. According to M.T., Morsie "said you liked it and now I'm his woman he said." M.T. later wrote a letter to the apartment complex detailing her allegations against Morsie and provided information regarding this incident to Detective Josh Holbrook of the Lebanon Police Department.

{¶ 6} The state next called D.B. to testify. D.B. testified she met Morsie on a chat line sometime between June and July of 2010. According to D.B., the chat line was "a dating thing" where you could send and receive voice messages from other users. After receiving a voice message from Morsie, D.B. testified they exchanged phone numbers and began having frequent conversations for several weeks. Their conversations eventually progressed to the point where D.B. agreed to come to Morsie's apartment to meet him on the evening of July 23, 2010.

{¶ 7} Upon arriving at his apartment via taxi, D.B. testified she sat and talked with Morsie on his couch. D.B also testified Morsie asked her to take a shower and leave the door open, which she agreed to do. After taking a shower, D.B. testified Morsie asked if she wanted to take some pills, which she believed were Vicodin. According to D.B., "I acted like I took them, but I put them in my purse." Shortly thereafter, D.B. testified Morsie went to his bedroom and brought back a "black dildo" sex toy. As D.B. testified, the following exchange then occurred:

> Q: Okay, and did he say anything to you when he brought that out?
>
> A: Yeah. He said he was going to use it on me, and I said no, you're not. And then I was ready to go. I thought well how am I going to get home, and he goes you're going to have to suck my dick to get home.

{¶ 8} D.B. refused Morsie's advances and instead called her brother and brother-in-law for a ride home. However, because it was late in the evening, neither answered their

phone.

{¶ 9} Realizing she did not have a ride home, D.B. testified she went into Morsie's bedroom where she sat on the bed and turned on the television. Morsie then entered the bedroom and began talking about sex. According to D.B., Morsie "said you're going to suck my dick, and I said, no, I'm not." To this, Morsie became upset and grabbed D.B. by the hair and pulled her head down towards his exposed penis. In response, D.B. grabbed Morsie's testicles and twisted. Specifically, D.B. testified:

> And he got really irate with me and grabbed my hair and tried to pull me down on him and I just grabbed his balls and started twisting them and he said you better let go, he said I'll kill you for that, you know, and so I said let go of my hair. He let go of my hair and I let go of him and I got up and started to go out the door and dial 9-1-1 and he grabbed my phone and snapped it in two.

{¶ 10} D.B. then testified she grabbed her belongings and picked up Morsie's cell phone that was lying on the coffee table. D.B. then ran from Morsie's apartment and called the police. Once police arrived, D.B. told them Morsie had pulled her hair and broke her phone. D.B., however, did not inform police Morsie attempted to force her to perform oral sex. Instead, she informed Detective Holbrook of these allegations approximately nine months later. When asked why she did not originally inform police Morsie tried to force her to perform oral sex upon him, D.B. testified she was ashamed and embarrassed.

{¶ 11} Following D.B.'s testimony, the state called A.S. to testify. A.S. testified she also met Morsie through a chat line. According to A.S., after speaking with Morsie for several months, A.S. agreed to meet Morsie at his apartment to drink a few beers and play cards with his friends. A.S. was subsequently dropped off at Morsie's apartment by her daughter on the evening of February 19, 2011. A.S. testified she was not going to Morsie's apartment for any type of sexual relationship.

{¶ 12} Upon arriving at Morsie's apartment, A.S. testified Morsie's friends, a man and

a woman, were "already trashed, they're drunk already when I got there." A.S. then proceeded to drink a soda pop and two beers, one of which Morsie got out of the refrigerator for her. When asked if there was anything different about the beer, A.S. testified it "tasted kind of funny."

{¶ 13} A.S. then testified the man and the woman left Morsie's apartment and Morsie turned on a pornographic video. In response, A.S. testified she told Morsie to turn off the pornography because she did not like it and that it was in poor taste to invite someone over only to turn on pornography. Shortly thereafter, A.S. testified she started getting light headed and woozy. A.S. then testified she went to the bathroom only to return to find Morsie had unzipped his pants and exposed his penis. According to A.S., Morsie then said "he wanted me to do what the girls on the video was doing" – perform oral sex.

{¶ 14} At this point, A.S. testified she was "real out of it," which was unusual for her after drinking just two beers. A.S. then testified as follows:

> Last thing I remember because kind of after that he was telling me what he wanted me to do and I said I'm not doing that, he grabbed me by the hair of the head but he let go, I said please don't grab me by the hair of the head. But he let go and the last thing I remember that was that and the conversation I woke up the next day and I was on the couch.

{¶ 15} A.S. then testified when she woke up she was completely naked and had semen on the side of her face and neck. After she awoke in Morsie's apartment, A.S. testified she tried to call her daughter to pick her up, but her phone battery had died. According to A.S., Morsie refused to let her use his phone and told her to leave. After leaving Morsie's apartment, A.S. testified she was able to call police from a neighboring apartment. Police subsequently arrived and took her to the hospital.

{¶ 16} The state then called K.C., the last of Morsie's four alleged victims, who also testified she met Morsie through a chat line. According to K.C., she had been talking and

texting with Morsie for approximately two weeks before she agreed to meet him at his apartment. Although never meeting Morsie in person, K.C. testified she thought she was in a relationship with Morsie. K.C. was dropped off at Morsie's apartment by her sister on March 20, 2011.

{¶ 17} Once she arrived at his apartment, K.C. and Morsie sat on the couch and talked. During this time, K.C. drank one Smirnoff beverage, whereas Morsie drank four Smirnoff beverages and several beers. Morsie then asked K.C. if she wanted any Xanax, which she declined. As the evening progressed, the pair began kissing when Morsie became aggressive and pulled K.C.'s hair and called her a "bitch." While still grabbing a hold of her hair, Morsie then pulled K.C.'s skirt down and inserted one of the Smirnoff bottles into her rectum. Although K.C. told him to stop, Morsie continued to insert the bottle into her rectum for several minutes. As K.C. testified, "I was crying and he didn't stop until about 15 or 20 minutes later and he then finally stopped but I was still crying because it hurt."

{¶ 18} After Morsie finally stopped inserting the bottle into her rectum, K.C. went into Morsie's bedroom and locked the door. However, Morsie was able to unlock the door and he again inserted the bottle into K.C.'s rectum and her vagina. When asked if she tried to stop Morsie during this second attack, K.C. testified she pushed the bottle away but Morsie removed her hand and held her down on the bed. After enduring this second attack, K.C. testified she was able to get away from Morsie and contact her sister, who then contacted the police. Police later recovered the bottle Morsie used to penetrate K.C.'s rectum and vagina in a nearby garbage dumpster.

{¶ 19} The state also called M.C., K.C.'s sister, Timothy Willis, M.T.'s friend and neighbor, as well as Detective Holbrook and Angela Liggett, a Sexual Assault Nurse Examiner at Bethesda North Hospital. Of significance, Detective Holbrook testified he met with each of the alleged victims during his investigation. According to Detective Holbrook,

there was never any indication any of the women knew each other prior to their encounters with Morsie. Detective Holbrook also testified Morsie admitted to previously owning a "black dildo" sex toy.

{¶ 20} The state then rested and Morsie moved for dismissal of all charges against him pursuant to Crim.R. 29. In ruling on the motion, the trial court dismissed the charge alleging Morsie attempted to rape A.S., but overruled the motion as it relates to the remaining charges against him. Morsie did not present any evidence in his defense, nor did he renew his motion to sever.

{¶ 21} After Morsie rested, the trial court took the matter under advisement, rendering a verdict the following day. In reaching its verdict, the trial court found Morsie guilty of two of three counts alleging sexual battery involving M.T., as well as both counts alleging sexual battery involving K.C., and the single count of attempted rape involving D.B. The trial court then sentenced Morsie to a total aggregate sentence of eight years in prison. Specifically, the trial court sentenced Morsie to 24 months in prison on each of the two counts of sexual battery involving M.T., to be served concurrently to one another; 36 months in prison on each of the the two counts of sexual battery involving K.C., to be served concurrently to one another and consecutive to the two counts of sexual battery involving M.T.; and three years in prison for the attempted rape involving D.B., to be served concurrently to all other counts. Morsie was also ordered to pay court costs.

{¶ 22} On July 25, 2012, Morsie filed a timely notice of appeal and a request for appointment of appellate counsel. Finding Morsie indigent, the trial court appointed appellate counsel for Morsie on August 6, 2012. Morsie's original appellate counsel, however, did not file a brief or act upon Morsie's behalf in any way. In fact, Morsie's original appellate counsel did not even respond to this court's January 18, 2013 show cause order. As a result, on February 14, 2013, this court dismissed Morsie's direct appeal, with prejudice. *State v.*

*Morsie*, 12th Dist. Warren No. CA2012-07-064 (Feb. 14, 2013) (Judgment Entry of Dismissal).

{¶ 23} On March 25, 2013, Morsie filed a pro se application to reopen his appeal. That same day, the Ohio Public Defender's Office filed a motion to reinstate Morsie's direct appeal and to appoint it as Morsie's new appellate counsel. In an entry filed May 10, 2013, this court granted Morsie's pro se application to reopen his appeal and appointed the Ohio Public Defender's Officer to represent him on appeal. *State v. Morsie*, 12th Dist. Warren No. CA2012-07-064 (May 10, 2013) (Entry Granting Application to Reopen Appeal). A notice of appearance was subsequently filed, as well as an appellate brief on Morsie's behalf, raising three assignments of error for review.

{¶ 24} Assignment of Error No. 1:

{¶ 25} THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED MR. MORSIE'S MOTION TO SEVER CERTAIN COUNTS IN HIS INDICTMENT, IN VIOLATION OF CRIM.R. 8 AND CRIM.R. 14, AND IN VIOLATION OF MR. MORSIE'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶ 26} In his first assignment of error, Morsie argues the trial court erred by denying his motion to sever the charges against him. We disagree.

{¶ 27} The decision to grant or deny a motion to sever is a matter in the trial court's discretion. *State v. Matthews*, 12th Dist. Butler No. CA2012-09-175, 2013-Ohio-3482, ¶ 35. In turn, this court reviews the trial court's decision under an abuse of discretion standard. *State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 11. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude was arbitrary, unreasonable, or unconscionable. *State v. Hancock*, 108 Ohio St.3d

57, 2006-Ohio-160, ¶ 130.

{¶ 28} It is well-established that "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 164 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340, 343 (1981). As a result, "[j]oinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Ashcraft*, 12th Dist. Butler No. CA2008-12-305, 2009-Ohio-5281, ¶ 14, quoting *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). Nonetheless, pursuant to Crim.R. 14, if it appears that the defendant would be prejudiced by joinder of the charged offenses, the trial court may grant a severance. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 95.

{¶ 29} While the defendant bears the burden of proving prejudicial joinder, the state may rebut a defendant's claim of prejudice by utilizing one of two methods. *State v. Moshos*, 12th Dist. Clinton No. CA2009-06-008, 2010-Ohio-735, ¶ 79. Initially, pursuant to the "other acts test," the state may rebut the defendant's claim of prejudice by demonstrating it could have introduced evidence of the joined offenses at separate trials pursuant to the "other acts" provision found in Evid.R. 404(B). *State v. Coley*, 93 Ohio St.3d 253, 259 (2001); *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 30. On the other hand, the state may separately negate a claim of prejudice by satisfying the less stringent "joinder test," which requires the state to merely demonstrate "that evidence of each crime joined at trial is simple and direct." *Moshos* at ¶ 79, quoting *Coley* at 260. Simply stated, "[t]he joinder test only requires that the evidence of each joined offense is simple and distinct and ensures that a jury would be capable of segregating the proof required for each offense." *State v. Kaufman*, 187 Ohio App.3d 50, 2010-Ohio-1536, ¶ 180 (7th Dist.).

{¶ 30} "A showing by the state that the evidence relating to each crime is simple and direct negates any claims of prejudice and renders joinder proper." *State v. Bice*, 12th Dist.

Clermont No. CA2008-10-098, 2009-Ohio-4672, ¶ 53. In turn, "[i]f the state can meet the joinder test, it need not meet the stricter 'other acts' test." *Moshos* at ¶ 79, quoting *State v. Johnson*, 88 Ohio St.3d 95, 109 (2000). Thus, "an accused is not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)." *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

{¶ 31} At the outset, we note that Morsie did not renew his motion to sever at the close of the state's case or at the close of all evidence. As this court has stated previously, where a defendant files a motion to sever, but ultimately fails to renew his motion at the close of either the state's case or presentation of all evidence, such as the case here, the defendant waives all but plain error on appeal. *State v. Wright*, 12th Dist. Warren No. CA2008-03-039, 2008-Ohio-6765, ¶ 11; *State v. Washington*, 1st Dist. Hamilton No. C-090561, 2010-Ohio-3175, ¶ 38; *see also State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, ¶ 68. Pursuant to Crim.R. 52(B), notice of plain error is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 30.

{¶ 32} After a thorough review of the record, we find no error in the trial court's decision to deny Morsie's motion to sever. In this case, the state presented an organized, chronological overview of the facts and charges alleged against Morsie by the four women. Moreover, the witnesses were all "victim specific" in their testimony. This included extensive testimony from each of the alleged victims detailing their own alleged unwanted sexual encounters with Morsie, as well as testimony from Detective Holbrook regarding his investigation into Morsie's conduct as it relates to each of the four alleged victims. The evidence pertaining to each victim and each offense could easily be segregated. Therefore, due to the separate and distinct nature of the evidence of each crime, we find Morsie was not prejudiced by the joinder of the charged offenses.

{¶ 33} Our finding is further supported by the fact this matter was tried to the bench. "If a jury is believed capable of segregating uncomplicated proof, a court would be considered even more capable." *In re Hollobaugh*, 7th Dist. Mahoning No. 08 MA 22, 2009-Ohio-797, ¶ 34. In turn, "[s]ince this was a bench trial, we may presume that the trial court was not swayed by the number or nature of the charges, nor did it consider evidence that was admissible in one count in determining another count where that evidence was inadmissible." *State v. Hensley*, 2d Dist. Montgomery No. 11410, 1990 WL 31840, *9 (Mar. 19, 1990); *see also State v. Layne*, 12th Dist. Clermont No. CA2009-07-043, 2010-Ohio-2308, ¶ 60 (holding that "in reviewing a bench trial, an appellate court presumes that a trial court considered nothing but relevant and competent evidence in reaching its verdict"). This is especially true here considering the trial court actually dismissed the charge alleging Morsie attempted to rape A.S., as well as the trial court's finding Morsie not guilty as to one of the three charges alleging he sexually battered M.T.

{¶ 34} In addition, there is no indication in the record that Morsie would have defended the charges differently had they been tried separately as opposed to jointly. *See Rose*, 2012-Ohio-5607 at ¶ 21; *see also Franklin*, 62 Ohio St.3d at 123. In fact, Morsie failed to provide any evidence in his defense. Furthermore, based on the strength of the state's evidence, we find it clear that the state did not merely "attempt to prove one case simply by questionable evidence of other offenses." *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 170, quoting *State v. Jamison*, 49 Ohio St.3d 182, 187 (1990). Rather, the state provided a detailed account of Morsie's conduct, thereby leading to his conviction. Therefore, because we find no error, let alone plain error, in the trial court's decision denying Morsie's motion to sever, Morsie's first assignment of error is overruled.

{¶ 35} Assignment of Error No. 2:

{¶ 36} THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT IMPOSED

CONSECUTIVE PRISON SENTENCES AGAINST MR. MORSIE WITHOUT MAKING STATUTORILY MANDATED FINDINGS IN SUPPORT OF CONSECUTIVE SENTENCES, AND WHEN IT FAILED TO NOTIFY MR. MORSIE THAT HE COULD BE SUBJECTED TO COMMUNITY SERVICE IF HE FAILED TO PAY COURT COSTS, IN VIOLATION OF MR. MORSIE'S RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

{¶ 37} In his second assignment of error, Morsie argues the trial court improperly imposed consecutive sentences when it failed to comply with the statutory requirements of R.C. 2929.14(C)(4). Morsie also argues the trial court erred when it imposed court costs without notifying him that he could be ordered to perform community service if he failed to pay his court costs in conformance with the now former R.C. 2947.23(A)(1)(a). The state concedes, and we agree, the trial court erred in both instances. *See, e.g., State v. Warren*, 12th Dist. Clermont No. CA2012-12-087, 2013-Ohio-3483, ¶ 16 (finding a consecutive sentence is contrary to law where the trial court fails to make the consecutive sentencing findings); *State v. Accorinti*, 12th Dist. Butler Nos. CA2012-10-205 and CA2012-11-221, 2013-Ohio-4429, ¶ 27 (stating the applicable community service notification is mandatory and must be provided by the trial court at sentencing). Morsie's second assignment of error is therefore well-taken and sustained.

{¶ 38} Assignment of Error No. 3:

{¶ 39} ORIGINAL APPELLATE COUNSEL PROVIDED MR. MORSIE WITH INEFFECTIVE ASSISTANCE, IN VIOLATION OF MR. MORSIE'S RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

{¶ 40} In his third assignment of error, Morsie argues his original appellate counsel provided him with ineffective assistance of appellate counsel by failing to file an appellate

brief and otherwise failing to act upon his behalf in any way. After reviewing the record, we agree that Morsie's original appellate counsel was ineffective in his representation by failing to file an appellate brief. However, although Morsie was originally provided with ineffective assistance of appellate counsel, this court has since granted Morsie's application to reopen his appeal and appointed him with new appellate counsel who timely filed an appellate brief with this court. As a result, we find any prejudice resulting from Morsie's original appellate counsel's failures has now been remedied, thereby rendering this assignment of error moot. *See, e.g., State v. Bort*, 9th Dist. Lorain No. 96CA006597, 1998 WL 791809, *4 (Nov. 4, 1998) (overruling claim of ineffective assistance of original appellate counsel where court granted application for delayed appeal and considered merits of the case). Therefore, Morsie's third assignment of error is rendered moot and overruled.

{¶ 41} Judgment affirmed in part, reversed in part and remanded for the limited purpose of resentencing.

HENDRICKSON, P.J., and RINGLAND, J., concur.